# Exhibit A

## 89 prisoners resume hunger strike at Guantanamo
Detainees say US military broke July pact

Charlie Savage
Boston Globe Staff
August 26, 2005

WASHINGTON -- New tensions between Guantanamo Bay detainees and the US military have prompted 89 prisoners to resume a hunger strike that so far has left seven hospitalized, a spokesman for the military operation confirmed yesterday.

The prisoners, protesting their living conditions and their continued detention without trials, had undertaken a widespread hunger strike that ended in July. Word that the hunger strike had resumed was disclosed yesterday by Clive Stafford Smith, a British human rights lawyer who returned from visiting clients at the base a week ago.

Smith warned that many detainees have grown so desperate that they intend to starve themselves to death in an effort to create a public relations disaster for the US military. No detainee has died at the prison since it opened in January 2002, but, in the view of lawyers who have talked to clients, there have been signs of extreme frustration this summer.

According to Smith's newly declassified notes, his client Binyam Mohammed, a British refugee from Ethiopia, told him on Aug. 11 that many among the prison population had decided to resume their hunger strike. The decision was sparked by rumors of a violent interrogation session and two rough extractions of detainees from their cells, as well as a new incident of alleged desecration of a copy of the Koran, the Muslim holy book.

The detainees viewed the rumors as a violation of an agreement struck at the end of July to bring an end to the hunger strike, Smith said. Meeting with detainee representatives, the military had promised a series of improvements to living conditions if they would start eating again.

"They have betrayed our trust," Smith's declassified notes quote Mohammed as saying. "Therefore the strike must begin again. Some have already begun. . . . I do not plan to stop until I either die or we are respected. People will definitely die."

Army Colonel Brad Blackner, a spokesman for the prison operation, confirmed yesterday that "detainees began fasting to protest their continued detention" on Aug. 8. He said the military views this as a continuation of the July hunger strike, not a new one.

"We are monitoring some detainees who have missed at least nine meals over a 72-hour period, which we define as a hunger strike," Blackner said.

Smith was the last attorney to return from Guantanamo because the military did not allow any detainee representatives to visit the base last week. He represents several dozen detainees, but only his notes of his conversation with Mohammed have been partially declassified. "This is all that is unclassified for now, but you can imagine that there is much more," he said. "This is very urgent, as you can infer from the statement that if they stopped eating on Aug. 11 or so, this means that some of them could be getting in serious physical problems by the next week or so."

But Blackner said that the prison had dealt with hunger strikes regularly since the start, and that medical staff were closely monitoring the fasting detainees. Camp policy is to force-feed any detainee "to avert death from fasting and from dehydration," he said.

Smith's report of the resumption of the hunger strike was made as the military has declassified the notes of other lawyers who visited the base in the last month, clearing them to disclose what their clients told

them about what has been happening this summer.

Several lawyers said their clients reported that about 200 of the 500 prisoners participated in the July hunger strike, resulting in several dozen hospitalizations requiring intravenous fluids. The military said the number was closer to 100. Many detainees started to eat again around July 28, after the military promised to make concessions that allegedly varied from specific improvements to their living conditions to assurances they would receive trials.

Detainees were allegedly promised better access to books and that they would receive bottled drinking water with each meal, instead of having to drink what they considered unpalatable water out of the sinks in their cells. The military said last week it was seeking to expand the size of its library. Several attorneys said the military had started supplying bottled water in early August.

Jonathan Hafetz, who visited the base in late July to meet with a Qatari client, said his newly declassified notes indicate that the prisoners were primarily interested in improving their physical and religious conditions.

"He attributed the strike to the bad water and the lack of respect for Islam," he said. "For example, guards laughed at prisoners when they are praying and disrespect the Koran when they go into a cell to [restrain] a prisoner."

Joshua Colangelo-Bryan, who visited his six Bahraini clients in late July and early August, said things did improve after the agreement. In a cellblock where at least one of his clients is housed, he said, the military began turning off loud industrial fans during the calls-to-prayer.

"It was also said that international law would be recognized at Guantanamo, whatever that means," Colangelo-Bryan said. "It seems there was a probationary period . . . and if things did not change within that time, then a hunger strike of more severe proportions could be undertaken."

By the end of the first week of August, there was rising discontent among detainees who believed that they had been misled in order to get them to start eating again. Lawyer David Remes said his Yemeni clients told him during the first week of August that detainees were starting to doubt the promises that had been made in order to get them to relent.

"There is a sense that the government tricked them into ending their hunger strike by promising them the moon because the government couldn't tolerate a situation in which detainees were placing themselves at risk of death or serious injury as a result of being on the hunger strike," Remes said.

# Exhibit B

Case 1:05-cv-01724-RMU    Document 2-2    Filed 09/20/2005    Page 5 of 42
CNN.com - Hunger strike at Guantanamo grows - Sep 13, 2005

Page 1 of 3


**.com** ⬛ Member Services

International Editio

SEARCH   ⦿ THE WEB   ○ CNN.com   [                    ]   SEARCH   Powered by ▲

Home Page
World
U.S.
Weather
Business
Sports
Politics
Law
Technology
Science & Space
Health
Entertainment
Travel
Education
Special Reports
Video
Autos

Whistle while
you work...
and play!
citi

**SERVICES**
E-mail Newsletters
Your E-mail Alerts
RSS
CNNtoGO
Contact Us
**SEARCH**
⦿ WEB ○ CNN.com

SEARCH Powered by
YAHOO! search

# WORLD

## Hunger strike at Guantanamo grows

### Eighteen detainees being force-fed; 128 now refusing to eat

From Mike Mount
CNN

Tuesday, September 13, 2005; Posted: 10:27 p.m. EDT (02:27 GMT)

**WASHINGTON (CNN) -- The number of Guantanamo Bay detainees taking part in a hunger strike has swelled to about a quarter of the prison population over the past month, according to Pentagon officials.**

Since August 8, the number of detainees refusing food has slowly increased from several dozen to 128, according to the Pentagon.

Eighteen prisoners are in medical facilities forcibly receiving nutrition intravenously or through nasal tubes, Pentagon officials said.

Last month officials said 89 detainees were refusing to eat and 12 were receiving forced nutrition in the medical facility.

Since the prison camp at the U.S. Naval Station in Guantanamo Bay, Cuba, opened in January 2002, there have been numerous hunger strikes by detainees. No prisoner has died from starvation, according to Pentagon officials.

"Regulations are the same at Guantanamo as they are in the U.S. prison system, and prisoners will not be allowed to kill themselves by starving themselves," a Pentagon official said.

Pentagon officials said the detainees are protesting their continued detention, but past detainee protests have occurred because of perceived treatment of the Quran by prison guards and treatment of the detainees by guards.





advertiser links          what's this?

**Save on All Your Calls with Vonage**
When looking for local regional and long distance calling, use Vonage to make...
www.vonage.com

**MyCashNow - $100 - $1,500 Overnight**
Payday Loan Cash goes in your account overnight. Very low fees. Fast decisions....
www.mycashnow.com

**Refinance Rates Fall Again**
Get $150,000 loan for $720 per month. Refinance while rates are low.
www.lowermybills.com

**Refinance Rates Hit Record Lows**
Get $150,000 loan for $720 per month. Refinance while rates are low.
www.lowermybills.com

**RELATED**

• U.S. officials: Transfer talks active
• CNN tours Gitmo prison camp
• U.N. experts blast U.S.

Search Je

Enter Keyw
Enter City
career bu

Finc
Air

Chec
Book
FLYi.

fly

⓵ inc

The previous hunger strike at the prison, known as Camp Delta, was in late July, when 68 detainees stopped eating.

All of the detainees started eating again on their own before the August 8 hunger strike, according to Pentagon officials.

The Washington Post reported Monday that lawyers for some of the detainees claim their clients are refusing to eat to protest their detention as well as the beatings they allege some detainees are receiving from prison guards.

Pentagon officials flatly deny that any of the detainees are beaten, including uncooperative ones.

- Russian detainees freed
- Suicide tries called 'coordinated'

**YOUR E-MAIL ALERTS**

Guantanamo Bay Naval Base (Cuba)    ◯

ACTIVATE  or Create Your Own

Manage Alerts | What Is This?

The Defense Department says more than 500 detainees are being held at the detention facility. Most were captured during the U.S.-led war in Afghanistan against the al Qaeda terrorist network and its local allies.

More than 30 countries are represented. But citizens from Saudi Arabia, Afghanistan and Yemen account for the majority of the detainees, 129, 110 and 107, the two U.S. officials told CNN last month.

Human rights activists and the Red Cross have criticized the treatment of prisoners at Guantanamo Bay. The controversy surrounding the facility in recent months prompted some lawmakers to suggest that it may need to be shut down.

But Bush administration officials have defended Guantanamo Bay. Vice President Dick Cheney said in June that the U.S. Guantanamo policy "is the correct one" and that all detainees are "treated with respect and dignity." (Full story)

News of the growing detainee protest came a day after Pentagon officials said Mullah Adbul Salam Zaeef, once the Taliban's ambassador to Pakistan and its primary spokesman during the early days of the U.S. invasion of Afghanistan, was released after an agreement between the Afghan government and the United States.

He was flown to Afghanistan from the Cuban base. He had been held at the prison camp since January 2002 after being arrested by Pakistani authorities and turned over to the United States.

**Story Tools**

◉✍ SAVE THIS    ◉✉ E-MAIL THIS

◉🖨 PRINT THIS    ◉☆ MOST POPULAR

————— advertisement —————



Click Here to try 4 Free Trial Issues of Time!

**WORLD**

Section Page · Video · International Edition

Iraq blasts claim 100 lives



- 2nd embassy blast death sentence
- U.N. reform agenda watered down
- Nigerians protest at fuel prices

**TOP STORIES**

Home Page · Video · Most Popular

Nursing home owners charged



- Baghdad attacks kill more than 100
- Carolinas brace for Hurricane Ophelia
- Roberts sidesteps specifics

# Exhibit C

  **WMA, the global representative body for physicians**  

## THE WORLD MEDICAL ASSOCIATION

Français | Español

Home
About the WMA
WMA History
Policy
Members
Press Releases
Publications
Meetings and Events
Ethics Unit
Human Rights
Continuing Medical Education

## Policy

**World Medical Association Declaration on Hunger Strikers**

Adopted by the 43rd World Medical Assembly Malta, November 1991and editorially revised at the 44th World Medical Assembly Marbella, Spain, September 1992

### PREAMBLE

1.  The doctor treating hunger strikers is faced with the following conflicting values:

    1.  There is a moral obligation on every human being to respect the sanctity of life. This is especially evident in the case of a doctor, who exercises his skills to save life and also acts in the best interests of his patients (Beneficence).

    2.  It is the duty of the doctor to respect the autonomy which the patient has over his person. A doctor requires informed consent from his patients before applying any of his skills to assist them, unless emergency circumstances have arisen in which case the doctor has to act in what is perceived to be the patient's best interests.

2.  This conflict is apparent where a hunger striker who has issued clear instructions not to be resuscitated lapses into a coma and is about to die. Moral obligation urges the doctor to resuscitate the patient even though it is against the patient's wishes. On the other hand, duty urges the doctor to respect the autonomy of the patient.

    1.  Ruling in favour of intervention may undermine the autonomy which the patient has over himself.

    2.  Ruling in favour of non-intervention may result in a doctor having to face the tragedy of an avoidable death.

3.  A doctor/patient relationship is said to be in existence whenever a doctor is duty bound, by virtue of his obligation to the patient, to apply his skills to any person, be it in the form of advice or treatment.

This relationship can exist in spite of the fact that the patient might not consent to certain forms of treatment or intervention.

Once the doctor agrees to attend to a hunger striker, that person becomes the doctor's patient. This has all the implication and responsibilities inherent in the doctor/patient relationship, including consent and confidentiality.

4.  The ultimate decision on intervention or non-intervention should be left with the individual doctor without the intervention of third parties whose primary interest is not the patient's welfare. However, the doctor should clearly state to the patient whether or not he is able to accept the patient's decision to refuse treatment or, in case of coma, artificial feeding, thereby risking death. If the doctor cannot accept the patient's decision to refuse such aid, the patient would then be entitled to be attended by another physician.

### GUIDELINES FOR THE MANAGEMENT OF HUNGER STRIKERS

Since the medical profession considers the principle of sanctity of life to be fundamental to its practice, the following practical guidelines are recommended for doctors who treat hunger strikers:

1.  **DEFINITION**
    A hunger striker is a mentally competent person who has indicated that he has decided to embark on a hunger strike and has refused to take food and/or fluids for a significant interval.

2.  **ETHICAL BEHAVIOUR**
    1.  A doctor should acquire a detailed medical history of the patient where possible.

    2.  A doctor should carry out a thorough examination of the patient at the onset of the hunger strike.

    3.  Doctors or other health care personnel may not apply undue pressure of any sort on the hunger striker to suspend the strike. Treatment or care of the hunger striker must not be conditional upon him suspending his hunger strike.

WMA - Policy                                                                                          Page 2 of 2

4.   The hunger striker must be professionally informed by the doctor of the clinical consequences of a hunger strike, and of any specific danger to his own particular case. An informed decision can only be made on the basis of clear communication. An interpreter should be used if indicated.

5.   Should a hunger striker wish to have a second medical opinion, this should be granted. Should a hunger striker prefer his treatment to be continued by the second doctor, this should be permitted. In the case of the hunger striker being a prisoner, this should be permitted by arrangement and consultation with the appointed prison doctor.

6.   Treating infections or advising the patient to increase his oral intake of fluid (or accept intravenous saline solutions) is often acceptable to a hunger striker. A refusal to accept such intervention must not prejudice any other aspect of the patients health care. Any treatment administered to the patient must be with his approval.

3.  CLEAR INSTRUCTIONS
The doctor should ascertain on a daily basis whether or not the patient wishes to continue with his hunger strike. The doctor should also ascertain on a daily basis what the patient's wishes are with regard to treatment should he become unable to make an informed decision. These findings must be recorded in the doctors personal medical records and kept confidential.

4.  ARTIFICIAL FEEDING
When the hunger striker has become confused and is therefore unable to make an unimpaired decision or has lapsed into a coma, the doctor shall be free to make the decision for his patient as to further treatment which he considers to be in the best interest of that patient, always taking into account the decision he has arrived at during his preceding care of the patient during his hunger strike, and reaffirming article 4 of the preamble of this Declaration.

5.  COERCION
Hunger strikers should be protected from coercive participation. This may require removal from the presence of fellow strikers.

6.  FAMILY
The doctor has a responsibility to inform the family of the patient that the patient has embarked on a hunger strike, unless this is specifically prohibited by the patient.



[ Introduction and history | Handbook | Council Resolutions ]

2003 - Designed by GoldenNet

# Exhibit D

### *Position Statement on Hunger Striking Prisoners*
Adopted 7 August 1994

The Policy and Standards Committee, chaired by Steven Spencer, MD, began their work on a position statement on the management of the hunger striking prisoner in response to a statement issued by the World Medical Association (WMA). The original WMA statement was published in the Winter 93 issue of *CorHealth*.

Prior to the development of this ACHSA position statement, the WMA statement was distributed to all state Department of Corrections and state medical associations, along with a questionnaire regarding their policies. Responses were received from 23 state corrections departments and 6 state medical societies.

A draft statement was developed and presented for discussion at the 1994 Multi-disciplinary Training Conference. More than 100 participants contributed their thoughts for consideration.

The following statement was based on the input from state departments of corrections, state medical societies, and concerned health care professionals. This statement was officially adopted by the ACHSA Board of Directors on 7 August 1994.

> *The management of a hunger striking prisoner presents an ethical conflict between the obligation to preserve life and relieve suffering on the one hand, and the obligation to respect patient autonomy on the other. Correctional health care providers should make every reasonable effort to honor patient self-determination. However, the deprivation of freedom which incarceration imposes will affect decision making by the inmate patient. Therefore, special efforts in patient education and counseling are indicated.*

> *A prisoner may begin a hunger strike for various reasons. If pursued, it may have a fatal outcome, unless there is medical intervention. Correctional health care providers have a special duty to protect inmates from self-destructive behavior. When a prisoner initiates a hunger strike, and efforts to counsel and dissuade are not successful in terminating the strike, the responsible physician is obligated to obtain thorough medical and psychiatric evaluations and to monitor weight loss and other parameters of deteriorating health in an appropriate medical setting. Treatment of intercurrent medical problems must be offered. The hunger striking inmate should be informed that authorization will be requested to intervene with forced feeding when life is in danger.*

> *Since forced feeding is a form of involuntary treatment, the responsible medical authority must seek the consent of the court or a legally appointed guardian, following the local requirements for involuntary treatment. The physician should make it clear to the court and to all others concerned, however, that ethical medical conduct*

American Correctional Health Services Association                                    Page 7 of 7

*in this setting demands medical intervention to preserve life from actions that are self-destructive.*

*ACHSA members should give careful consideration to the development of policies and procedures which provide a responsible and compassionate approach to the hunger striking prisoner, and which make it clear that efforts will be made to intervene with forced feeding in order to save life.*

---

**American Correctional Health Services Association**
250 Gatsby Place, Alpharetta, GA 30022-6161
*Toll Free* 1-877-918-1842  *Fax* 770-650-5789
Email: admin@achsa.org or achsa@bellsouth.net
Privacy Policy    Conference Refund Policy    Exhibit Refund Policy

# Exhibit E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SALEH ABDULLA AL-OSHAN, *et al.*, | **Case No. 1: 05-CV-00520 (RMU)** |
| Petitioners/Plaintiffs, | |
| v. | |
| GEORGE W. BUSH, *et al.*, | |
| Respondents/Defendants. | |

| | |
|---|---|
| NASSER MAZYAD ABDULLAH AL-SUBAIY, *et al.*, | **Case No. 1: 05-CV-01453 (RMU)** |
| Petitioners/Plaintiffs, | |
| v. | |
| GEORGE W. BUSH, *et al.*, | |
| Respondents/Defendants. | |

**DECLARATION BY JULIA TARVER, ESQ.**

I, Julia Tarver, declare that the following statements are true to the best of my knowledge, information, and belief:

1.      I am a member of the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for the *Al-Oshan* and *Al-Subaiy* Petitioners in the above-captioned action. I offer this Declaration in support of Petitioners' Motion to Compel Information Related to Petitioners' Medical Treatment.

2.     Based on our communications with them, we believe that the majority, if not all, of our clients are participants in the current hunger strike.

3.     In July 2005, my colleagues and I visited with nine clients at Guantánamo.

4.     During this visit, we learned that countless detainees – as media accounts had already revealed – were participating in a hunger strike to protest the inhumane conditions at Guantánamo.

5.     Through our meetings, we learned that several, if not all, of our clients had been or were participating in the hunger strike.  They confirmed media reports that  the reasons for the hunger strike included Respondents continued abusive, inhumane treatment, lack of clean water and adequate medical care, and a demand – one Petitioners have pursued in these proceedings – that the detainees be formally charged by the United States Government and told the reasons for their continued detention.

6.     One of our clients who participated in this hunger strike was a juvenile at the time of his detention by the United States, and we believe he is one of the youngest detainees held at Guantánamo.

7.     For approximately one month, our client refused food.  For nine to ten days, he refused water.

8.     Prior to our visit, our client had been hospitalized for several days. He was unconscious for at least four days' time, and fed intravenously.  Indeed, he had to be transferred from the clinic in a medical van to meet with us.  He was very weak and in a precarious medical condition that was obvious even to us as laypersons.

2

9.     Our client told us that the day before our visit he ended his participation in the hunger strike because he had received repeated visits from individuals purporting to be high-level military officers.  These individuals assured him that the Government had already agreed to his release, that authorizations of such release had already been signed in Washington, and that he was scheduled to leave Guantánamo in approximately three weeks' time.

10.     As a result of this news, our client agreed to end his participation in the hunger strike.

11.     As evidenced by the within application, our client has not been released, nor have Respondents provided any notice of such release.

12.     Hence, because more than six weeks have passed since our last visit – and the Government has failed to provide the Court-ordered thirty-days' notice of release – we have no choice but to assume that these were false promises that were made to him by the Government, most likely to save Respondents from the domestic and international shame and embarassment that would result from a dead juvenile detainee at Guantanamo, who had starved himself to death because of the deplorable conditions there.

13.     Undoubtedly, the realization that the Government deceived him has likely had a terrible impact on our young client.

14.     We believe that our client has likely rejoined the current hunger strike, and, in light of his serious medical condition resulting from the last strike, we strongly believe his health is in grave danger.

15.    In addition, we believe other clients have also chosen to participate in the hunger strike.

16.    At least three of these clients have chronic medical conditions – including epilepsy – which will only be exacerbated by the refusal of food and water, and which require immediate medical attention.

17.    The Government has failed to allow us any form of reliable access to our clients.

18.    In the past, our mail to clients, sent via Respondents' legal mail channels, has been delayed for well over six weeks.

19.    Nor have we received mail from our clients in a timely fashion.  In fact, just this afternoon, we learned that letters from clients, dating back to June 2005, had just been delivered to the secure facility in Washington D.C.  The Department of Justice Court Security Office informed us that a clerical error had delayed the delivery of this mail for *three* months.

20.    I declare, under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 15th day of September 2005
New York, New York

_____/s/_____
Julia Tarver

4

# Exhibit F

Printer Friendly

Page 1 of 1

## CHICAGO SUN-TIMES
**www.suntimes.com**

Back to regular view
http://www.suntimes.com/output/news/cst-nws-hung16.html

Print this page

# Hunger strike grows in Guantanamo

*September 16, 2005*

SAN JUAN, Puerto Rico -- A hunger strike at the U.S. prison for terror suspects in Guantanamo Bay, Cuba, has grown to its largest point since detainees began their latest protest more than a month ago, a military official said Thursday.

After 11 detainees joined the protest overnight, there are now 131 taking part in the hunger strike, said Maj. Jeff Weir, a spokesman for the detention center.

Twenty-one of the striking prisoners were hospitalized in stable condition at the prison medical clinic, including 20 who were being tube-fed, Weir said.

The military considers a hunger strike to be a form of suicide and Weir said that one prisoner was restrained after he resisted having a feeding tube inserted.

Guantanamo officials said this latest hunger strike began Aug. 8 with 76 detainees protesting their confinement. It has since grown to more than a quarter of the approximately 500 detainees.

*AP*

Copyright © The Sun-Times Company
All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

# Exhibit G

08/23/05  TUE 12:57 FAX 202 305 7872     LITIGATION SEC.     @016

STATEMENT OF BINYAM MOHAMMED.

I AM BINYAM MOHAMMED. I AM 27 YEARS OLD. I WAS SEIZED BY THE AMERICANS ON APRIL 10, 2002, AND I HAVE BEEN HELD BY THEM SINCE. THEY TOOK ME FORCIBLY TO MOROCCO WHERE I ENDURED 18 MONTHS OF TORTURE FROM JULY 21, 2002, TO JANUARY 21, 2004. I WAS THEN TAKEN BY THE AMERICANS TO AFGHANISTAN AND, ON SEPTEMBER 19, 2004, TO GUANTANAMO BAY.

ALL THIS TIME THE CONDITIONS OF MY CONFINEMENT HAVE BEEN A NIGHTMARE. ALONG WITH OTHER U.S. PRISONERS, I HAVE BEEN ROUTINELY HUMILIATED AND ABUSED, AND CONSTANTLY LIED TO.

WE WERE VERY, VERY PATIENT HERE IN GUANTANAMO. BUT FINALLY ENOUGH WAS ENOUGH, AND IN LATE JUNE WE ORGANIZED A STRIKE ACROSS THE PRISON. PEOPLE REFUSED FOOD AND WATER, SOME FOR OVER 20 DAYS, AND BECAME SO WEAK THEY WERE HOSPITALIZED. THEY REFUSED AN I.V. DRIP AND THE DOCTOR TOLD THEM THAT HE COULD NOT FORCE THEM TO TAKE SUSTENANCE EVEN IF THEY WERE IN A COMA. WE HAD THE PEOPLE IN HOSPITAL CONFIRM TWICE BEFORE WITNESSES THAT THEY REFUSED RESUSCITATION IF IT CAME TO THAT.

THE ADMINISTRATION EVENTUALLY AGREED, IF WE STOPPED THE HUNGER STRIKE, TO NEGOTIATE IN GOOD FAITH. I HAD NOT EATEN FOR JUST FOUR DAYS BUT I HAD BEEN VERY WEAK AND FALLEN DOWN.

THE ADMINISTRATION PROMISED THAT IF WE GAVE THEM

UNCLASSIFIED

08/23/05  TUE 12:57 FAX 202 305 7872        LITIGATION SEC.                          ☑019

TEN DAYS, THEY WOULD BRING THE PRISON INTO COMPLI-
ANCE WITH THE GENEVA CONVENTIONS. THEY SAID THIS HAD
BEEN APPROVED BY DONALD RUMSFELD HIMSELF IN WASHINGTON
D.C.

AS A RESULT OF THESE PROMISES, WE AGREED TO END THE
STRIKE ON JULY 28th 2005.

IT IS NOW AUGUST 11th 2005. THEY HAVE BETRAYED OUR
TRUST (AGAIN). HISHAM FROM TUNISIA WAS SAVAGELY BEATEN
IN HIS INTERROGATION, AND THEY PUBLICALLY DESECRATED THE
QUR'AN (AGAIN). SAAD FROM KUWAIT WAS ERF'd FOR REFUSING
TO GO (AGAIN) TO INTERROGATION BECAUSE THE FEMALE INTERROGATOR
HAD SEXUALLY HUMILIATED HIM (AGAIN) FOR 5½ HOURS. OMAR THE
KID FROM CANADA WAS ERF'd (AGAIN) FOR REFUSING TO GO TO
ANOTHER ILLEGAL INTERROGATION.

THEREFORE THE STRIKE MUST BEGIN AGAIN. SOME HAVE
ALREADY BEGUN - 150 HAVE BEGUN IN CAMPS I, II & III.  60
PEOPLE IN CAMP I BEGAN TODAY.

I WILL BEGIN TOMORROW - FRIDAY AUGUST 12th, 2005.  I
DO NOT PLAN TO STOP UNTIL I EITHER DIE OR WE ARE RESPECTED.
SOME PEOPLE WILL DEFINITELY DIE.

BOBBY SANDS PETITIONED THE BRITISH GOVERNMENT TO STOP
THE ILLEGITIMATE INTERNMENT OF IRISHMEN WITHOUT TRIAL.
HE HAD THE COURAGE OF HIS CONVICTIONS AND HE STARVED HIMSELF
TO DEATH. NOBODY SHOULD BELIEVE FOR ONE MOMENT THAT MY

UNCLASSIFIED

BROTHERS HERE HAVE LESS COURAGE  - ALTHOUGH NOBODY

SHOULD BELIEVE, EITHER, BELIEVE THAT WE ARE TERRORISTS, OR

WE WILL RESORT TO VIOLENCE.  WE TAKE OUR INSPIRATION ~~...~~

~~...~~ ULTIMATELY AND

EXCLUSIVELY FROM OUR GOD.

WE ASK ONLY FOR JUSTICE :  TREAT US AS PROMISED

UNDER THE RULES OF THE GENEVA CONVENTIONS FOR CIVILIAN

PRISONERS WHILE WE ARE HELD, AND EITHER TRY US FAIRLY

FOR A VALID CRIMINAL CHARGE OR SET US FREE.

AUGUST 11th 2005

UNCLASSIFIED

Statement of Binyam Mohammed
Dated August 11, 2005

I am Binyam Mohammed. I am 27 years old. I was seized by the Americans on April 10, 2002, and I have been held by them since. They took me forcibly to Morocco where I endured 18 months of torture from July 21, 2002, to January 21, 2004. I was then taken by the Americans to Afghanistan and, on September 19, 2004, to Guantanamo Bay.

All this time the conditions of my confinement have been a nightmare. Along with other U.S. prisoners, I have been routinely humiliated and abused and constantly lied to.

We were very, very patient here in Guantanamo. But finally enough was enough, and in late June we organized a strike across the prison. People refused food and water, some for over 20 days, and became so weak they were hospitalized. They refused an I.V. drip and the doctor told them that he could not force them to take sustenance even if they were in a coma. He had the people in the hospital confirm twice, before witnesses, that they refused resuscitation if it came to that.

The administration eventually agreed, if we stopped the hunger strike, to negotiate on good faith. I had not eaten for just four days but I had been very weak and fallen down.

The administration promised that if we gave them ten days, they would bring the prison into compliance with the Geneva Conventions. They said this had been approved by Donald Rumsfeld himself in Washington, D.C.

As a result of these promises, we agreed to end the strike on July 28th, 2005.

It is now August 11th, 2005. They have betrayed our trust (again). Hisham from Tunisia was savagely beaten in his interrogation, and they publically (sic) desecrated the Qur'an (again). Saad from Kuwait was ERF'd for refusing to go (again) to interrogation because the female interrogator had sexually humiliated him (again) for 5 1/2 hours. Omar the kid from Canada was ERF'd (again) for refusing to go to another illegal interrogation.

Therefore the strike must begin again. Some have already begun – 150 have begun in Camps I, II & III. 60 people in Camp V begin today.

I will begin tomorrow – Friday, August 12th, 2005. I do not plan to stop until I either die or we are respected. People will definitely die.

Bobby Sands petitioned the British Government to stop the illegitimate internment of Irishmen without trial. He had the courage of his convictions and he starved himself to death. Nobody should believe for one moment that my brothers here have less courage – although nobody should believe, either, believe that we are terrorists, or will resort to violence. We take our inspiration, ultimately and exclusively, from our God.

We ask only for justice: treat us, as promised, under the rules of the Geneva Conventions for Civilian Prisoners while we are held, and either try us fairly for a valid criminal charge or set us free.

August 11th, 2005

Binyam Mohammed

# Exhibit H

You have been sent this message from jching@paulweiss.com as a courtesy of
washingtonpost.com

More Join Guantanamo Hunger Strike

By Carol D. Leonnig

   A month-old hunger strike at the U.S. military prison at Guantanamo Bay,
Cuba, has grown to include at least 128 detainees, 18 of whom are forcibly
receiving intravenous fluids or nutrition in the prison hospital, military
officials and detainee lawyers said yesterday.

   The captives are protesting their indefinite imprisonment and what they
describe as beatings administered by the prison's  Immediate Response Force
(IRF)-- squads of military personnel who are dispatched to put down
disturbances in detainees' cells. Some have said they will refuse to eat until
the military gives them a fair hearing or they die, according to their
attorneys.

   Military officials first acknowledged the hunger strike, the second of the
summer, on Aug. 25. Since then, the number of people hospitalized and in
serious physical danger has grown to 18, according to Maj. Jeffrey J. Weir, a
Guantanamo Bay spokesman. He said that step was taken to prevent any of the
approximately 520 prisoners at the U.S. Navy base prison from engaging in a
"form of suicide."

The hunger strike began in the first week of August, and, according to newly declassified accounts of detainees provided by their lawyers, has gradually spread across several camps at the prison. Detainees allege they have been severely beaten and are deeply frustrated at their indefinite detentions. Some have been held for 3 1/2 years without facing charges.

. Lawyers for the prisoners assert that more than 200 detainees are refusing food. An earlier hunger strike in June and July ended after military authorities met with a small group of detainees and promised improvements in their living conditions.

"They truly feel they have nothing left," said attorney David Remes, who represents several Yemeni detainees. "I'm not sure what the end point will be. But I do predict there will be death."

Binyam Mohammed, formerly of London, whose account was the first declassified, told his attorney on Aug. 11 of the new hunger strike. "I do not plan to stop until I die or we are respected," he said. "People will definitely die."

Another detainee, Libyan-born Omar Deghayes, told his lawyer he had not eaten in five weeks. "Many more people have fallen unconscious. . . . More are taken to hospital," he said.

Military officials have characterized the protest as a "fast" of prisoners aimed at grabbing attention, and say it involves 128 prisoners. They say its significance is exaggerated by their lawyers.

Weir said no detainees are in danger of dying and that the military's treatment is preventing them from losing critical nutrition. Of the 18 people hospitalized, 13 are being force-fed through nasal tubes and five are being given intravenous hydration.

On Aug. 25, the military said that 89 detainees were fasting and seven were hospitalized and receiving forced fluids or nutrition.

Weir said yesterday that the military does not allow beatings of detainees, and he believes the refusal to eat is part of a campaign to press for their transfer or release.

"My understanding is that it's just because of their continued detention," Weir said. "They're trying to call attention to that."

The majority of detainees at Guantanamo Bay have long insisted that they were captured by mistake by U.S. forces in Afghanistan in the fall of 2001. In some prisoners' cases, records show, the military has little but circumstantial evidence that the men engaged in or supported terrorist acts. The military's review of 558 cases resulted in 38 detainees being declared non-enemy combatants.

The appellate court for the District of Columbia heard arguments last week on the legality of the military holding the detainees indefinitely without giving them the chance to challenge their detentions in a U.S. court -- a follow-up to a U.S. Supreme Court ruling in 2004. But that dispute is expected to drag on until next year, and is likely to be appealed to the Supreme Court again.

Hunger strikes are not new to the prison. Detainees launched one in 2002 after allegations that guards and interrogators mistreated copies of the Koran. Military officials then issued new guidelines for proper treatment of the Islamic holy book, and the strike ended.

Detainees began a new strike in late June to protest their treatment and the quality of their food and water. They complained about solitary confinement, alleged beatings by IRF teams, and the use of uniform colors to signify how detainees should be treated. Detainees given white uniforms are considered cooperative while those assigned orange uniforms are considered uncooperative and treated more harshly, detainees said.

The prisoners halted the previous strike in the first days of August after military camp leaders met with a small "council" of detainees and promised improvements in their living conditions. But the strike resumed a few days later, some detainees told their lawyers, when news spread through the camp of a Tunisian detainee beaten by an interrogator and IRF teams hitting two others, according to detainees' reports to their lawyers.

Weir declined to discuss individual detainees' cases or allegations.

An Algerian detainee told his lawyer in a newly declassified report provided by his attorney that a new interrogator beat the Tunisian with an empty beverage cooler and a metal chair after the detainee refused to talk to him. The Algerian said he saw the Tunisian's bloodied, swollen eye after the session.

Weir declined to comment on those details. Other detainees' accounts of the strike have not yet been declassified by the military, their lawyers said.

Researcher Julie Tate contributed to this report.


Would you like to send this article to a friend? Go to
http://www.washingtonpost.com/ac2/wp-dyn/emailafriend?contentId=AR200509120169
0&sent=no&referrer=emailarticle


Visit washingtonpost.com today for the latest in:

News - http://www.washingtonpost.com/?referrer=emailarticle

Politics -
http://www.washingtonpost.com/wp-dyn/content/politics/?referrer=emailarticle

Sports -
http://www.washingtonpost.com/wp-dyn/content/sports/?referrer=emailarticle

Entertainment -
http://www.washingtonpost.com/wp-dyn/content/artsandliving/entertainmentguide/
?referrer=emailarticle

Travel -
http://www.washingtonpost.com/wp-dyn/content/artsandliving/travel/?referrer=em
ailarticle

Technology -
http://www.washingtonpost.com/wp-dyn/content/technology/?referrer=emailarticle

Want the latest news in your inbox? Check out washingtonpost.com's e-mail newsletters:

http://www.washingtonpost.com/ac2/wp-dyn?node=admin/email&referrer=emailarticle

Washingtonpost.Newsweek Interactive
c/o E-mail Customer Care
1515 N. Courthouse Road
Arlington, VA 22201

© 2004 The Washington Post Company

# Exhibit I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ABDULSALAM ALI** <br> **ABDULRAHMAN AL-HELA,** *et al.,* <br>     **Petitioners,** <br><br>     *v.* <br><br> **GEORGE W. BUSH, President of the** <br> **United States,** *et al.,* <br>     **Respondents.** | **Civil Action No. 05-1048 (RMU)** |
| **SAEED MOHAMMED SALEH** <br> **HATIM,** *et al.* <br>     **Petitioners,** <br><br>     *v.* <br><br> **GEORGE W. BUSH, President of the** <br> **United States,** *et al.,* <br>     **Respondents.** | **Civil Action No. 05-1429 (RMU)** |

## DECLARATION OF DAVID H. REMES

Declarant, David H. Remes, comes now upon penalty of perjury and declares that the following is true to the best of his knowledge, recollection and belief:

1.    My name is David H. Remes. I am over eighteen years old and am in all respects competent to give this Declaration. This Declaration is submitted in support of Petitioners' Motion to Compel Access to Information Related to Petitioners' Medical Treatment.

2.    I am an attorney-at-law licensed to practice in the District of Columbia. I am a partner at the law firm of Covington & Burling. My business address is 1201 Pennsylvania Ave. NW, Washington, DC, 20004.

3.  Covington & Burling represents seventeen Yemeni nationals imprisoned in Guantánamo Bay, Cuba, by the United States. The firm has filed habeas petitions on behalf of these prisoners in the United States District Court for the District of Columbia. The above-captioned cases are pending before Judge Ricardo M. Urbina.

4.  My most recent trips to Guantánamo to interview our clients took place on July 28–August 3 and August 31–September 4. During these visits I met with many of our clients – including each of the petitioners in the *Hatim* and *Al-Hela* cases – and learned about the wide-spread and potentially mortal hunger strikes in the detention facility.

5.  During my visit at the end of July, petitioner Abdulmalik Abdulwahab described his experience during the a hunger strike earlier in the summer: "I passed out 4 times during the hunger strikes – first 3 times was sent to clinic and they forcibly injected me with IV – my heartbeat went to 134 bpm – blood pressure at 155 – blood sugar under 60. I was urinating blood. I was in the best condition of those in the clinic. I went a total of 12–13 days without eating." Mr. Abdulwahab looked gaunt and seemed to have aged years since my last visit. I believe that Mr. Abdulwahab is likely to be participating in the current hunger strike as well.

6.  I believe that one or more of our clients in the above-captioned cases may be engaged in the current hunger strike. During my last visit at the end of August, I observed that Mr. Al-Hela had become strikingly gaunt. I also gleaned from our conversation that he was participating in the ongoing hunger strike.

7.  During both of my two recent visits, I was told by our military escort that several of our clients – whom we have interviewed on many occasions in the past year – refused to meet with my colleagues and me. No explanation for their refusal was provided. We do not

know whether their refusal was related to the current hunger strike. We do not know whether they have been hospitalized.

8.     On September 10, 2005, my colleague Marc Falkoff sent an email to Andrew Warden at the Department of Justice asking to be notified whether any of our clients were engaged in a hunger strike and whether any had been hospitalized – and if so, to be notified of their condition as soon as possible. Justice denied the request on September 12, 2005, with the statement that "GTMO is not in a position to provide continuous updates on that situation to you or, potentially, counsel for the more than 200 other habeas petitioners at GTMO."

FURTHER DECLARANT SAYETH NOT.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed on September 16, 2005.

           _____/s/_____
David H. Remes

# Exhibit J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------------- x

SALIM MOHAMMED ADAM BIN AMIR,                    :    Civil Action
                                                                                        No.: 05 CV 01724
                                              Petitioner,           :    (RMU)

                              -vs-                                          :

GEORGE W. BUSH, et al.,

                              Respondents.

------------------------------------------------------------------- x

## DECLARATION by GITANJALI S. GUTIERREZ

I, Gitanjali S.Gutierrez, under penalty of perjury declare that the following

statements are true to the best of my knowledge, information and belief:

1.        I am an attorney with the Center for Constitutional Rights, duly licensed to

practice law in the State of New York and am of counsel for Petitioner SALIM

MOHAMMED ADAM BIN AMIR.  The firm of Debevoise & Plimpton LLP is counsel

of record for Mr. BIN AMIR.  I make this declaration in support of Petitioner AL-

OSHAN's Motion to Compel Access to Counsel and for Information Related to

Petitioners' Medical Treatment.

2.        Based upon information appearing in the press and upon communications

with other counsel representing inmates at the Guantanamo Base in Cuba, I believe that a

large number, perhaps the majority, of detainees held therein are participating in a hunger

strike. My client, SALIM MOHAMMED ADAM BIN AMIR, and his "Next Friend,"
Bisher Al-Rawi, may be included in this group. Respondents themselves or their agents
have admitted that at least 131 detainees are participating in this strike.

3.    Through information gathered by communications with other counsel who
have visited their clients at Guantanamo who participated in an earlier hunger strike, the
detainees have taken this course of conduct to protest abusive and inhumane treatment,
lack of proper medical care, and denial of legal process.

4.    I have been granted interim security clearance and have visited
Guantánamo Bay Naval Station for attorney visits with other clients prior to representing
Petitioner Bin Amir. Because counsel have not yet met with Petitioner BIN AMIR we
cannot ascertain the exact status of our client's current medical condition.

5.    The Respondents have not yet filed a Factual Return in response to the
*Habeas Corpus* petition counsel filed on behalf of SALIM MOHAMMED ASAM BIN
AMIR on August 30, 2005.

6.    For these reasons, I believe it is incumbent upon Respondents to be
compelled by an Order of this Court to provide the undersigned with immediate access to
both SALIM MOHAMMED ADAM BIN AMIR and his "Next Friend" BISHER AL
RAWI, by telephone and in person, and to be provided with information regarding the
current status of their health, medical treatment, meal schedules, punishment and
hospitalization. Mr. BIN AMIR's other counsel, attorneys at Debevoise & Plimpton

2

LLP, have only recently become involved in these matters and are in the process of submitting their applications for security clearance. Once such applications are granted, one or more attorneys with Debevoise & Plimpton LLP will also seek leave to visit with or telephone Mr. BIN AMIR for the reasons described above, in the event that this matter continues to require the attention of counsel and the Court.

      7.      Time is of the essence.

      WHEREFORE, I join in the motion of AL-OSHAN and respectfully request the Court to grant the relief requested therein.

I declare under penalty of perjury that the forgoing is true and correct.

                    Executed on 16 September, 2005

                    ___Gitanjali S. Gutierrez___ /s/___

                    GITANJALI S. GUTIERREZ

3

# Exhibit K



"Terry.Henry@usdoj.g    To: "APrasow@paulweiss.com" <APrasow@paulweiss.com>
ov" <Terry.Henry        cc:
09/09/2005 07:24 PM     Subject: RE: Hunger strike

Dear Andrea:

I have conferred with DoD regarding your request for information concerning
the health status of the detainees listed in your September 2 and 6, 2005
e-mails to me. You seek information as to whether any have missed meals for
five days or longer, are in need of medical attention, or have or will be
hospitalized due to participation in a hunger strike.   Alternatively, you
seek telephone access to the detainees.

In addition to the normal quality medical care provided detainees, personnel
at GTMO are actively involved in monitoring the health status of any detainee
who is fasting or participating in a hunger strike. Security personnel monitor
each detainee's daily intake of meals and water. If it is determined that a
detainee has missed all meals over a period of time, typically three days,
though the time is shorter if the detainee is neither eating nor drinking,
medical personnel conduct a medical evaluation of the detainee and then
monitor him on a regular basis. If there is reason to believe that the fast or
hunger strike could endanger the detainee's health, he is admitted to the
detention hospital, where he is monitored, encouraged to eat food and drink
liquids, and counseled on the health risks associated with refusing to eat.
Involuntary medical treatment, such as IV hydration, is administered if the
detainee reaches a point where continued fasting would seriously threaten the
detainee's life or health.

The situation with regard to whether any particular detainee may be missing
meals or is in the detainee hospital is somewhat fluid and may change from
day-to-day. GTMO is not in a position to provide continuous updates on that
situation to you or, potentially, counsel for the more than 200 other habeas
petitioners at GTMO.   Similarly, GTMO is not in a position to support
telephonic access to the detainees for such purposes.  As noted above,
however, GTMO is appropriately monitoring and providing medical treatment to
detainees as warranted to preserve detainees' lives and health.

Sincerely,

Terry M. Henry
Senior Trial Counsel
Civil Division, Federal Programs Branch
U.S. Department of Justice
Tel. 202.514.4107

-----Original Message-----
From: APrasow@paulweiss.com [mailto:APrasow@paulweiss.com]
Sent: Friday, September 09, 2005 2:13 PM

To: Henry, Terry (CIV)
Cc: jtarver.PAULWEISS@paulweiss.com; JChing@paulweiss.com
Subject: Hunger strike

Terry,

Please let us know by the end of today if you will inform us of our clients'
medical conditons vis-a-vis the hunger strike and/or allow us telephone access
to them.

Regards,
AJP

This message is intended only for the use of the Addressee and may contain
information that is privileged and confidential.  If you are not the intended
recipient, you are hereby notified that any dissemination of this
communication is strictly prohibited.  If you have received this communication
in error, please erase all copies of the message and its attachments and
notify us immediately.



**Andrea J Prasow**
09/06/2005 04:46 PM

To: Terry.Henry@usdoj.gov
cc: Julia Tarver/PaulWeiss@PaulWeiss, Jennifer
Ching/PaulWeiss@PaulWeiss
Subject: RE: Urgent Information Requested About Detainee Health Status 

Terry,

We continue to require information as to whether any of the below-named detainees are in the hospital, or if any of them have refused meals for five days or longer. If it is easier for you, in lieu of confirmation from GTMO personnel, we are available to have telephone calls with each of our clients so that we may ascertain their health status directly. If we do not receive confirmation or telephone access to our clients by the end of the week, we will be forced to seek relief from the Court.

Regards,
AJP

"Terry.Henry@usdoj.gov" <Terry.Henry

**"Terry.Henry@usdoj.g
ov" <Terry.Henry**
09/02/2005 05:34 PM

To: Andrea J Prasow/PaulWeiss@PaulWeiss
cc:
Subject: RE: Urgent Information Requested About Detainee Health Status

Andrea,

I need to confer with my client regarding your request for information. Given that it is the holiday weekend, I doubt a response by Sunday afternoon is realistic. As respondents have previously indicated in various filings in the GTMO habeas cases, detainees receive quality medical care, and this would especially be the case with respect to any detainee on a hunger strike.

Regards,

Terry M. Henry
Senior Trial Counsel
Civil Division, Federal Programs Branch
U.S. Department of Justice
Tel. 202.514.4107

-----Original Message-----
From: APrasow@paulweiss.com [mailto:APrasow@paulweiss.com]
Sent: Friday, September 02, 2005 2:09 PM
To: Henry, Terry (CIV)
Cc: jtarver@paulweiss.com; JChing@paulweiss.com
Subject: Urgent Information Requested About Detainee Health Status

Terry,

We are aware that a second hunger strike has commenced at Guantanamo. Several of our clients may be affected by this strike, and we urgently need to know whether any of them have been hospitalized. Some of our clients have pre-existing medical conditions that may make them particularly susceptible to health concerns. Please confirm whether any of the following detainees have been or will be hospitalized, or whether they are in serious need of medical attention:

ISN#25  Majid Abdulla al Joudi

ISN#114  Yousif Mohammad Mubarak Al-Shehri

ISN#565  Abdul-Hakim Abdul-Rahman Al-Moosa

ISN#266  Abdulla Mohammad Al Ghanmi

ISN#647  Zaben Dhaher Al Shammari

ISN#42  Abdul Rahman Shalabi

ISN#243  Abdullah Aali Al Otaibi

ISN#13  Fahad Nasser Mohamed

ISN#58  Musa Abed Al Wahab

ISN#497  Nasser Mazyad Al-Subaiy

We appreciate your attention to this matter.  Given the urgency of the
situation, we would appreciate a response by Sunday afternoon.  We are
available by email or telephone throughout the weekend.

Regards,
AJP

Andrea J. Prasow | Associate
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas | New York, NY 10019-6064
(212) 373-3437 (Direct Phone)
(212) 492-0437 (Direct Fax)
aprasow@paulweiss.com | www.paulweiss.com

This message is intended only for the use of the Addressee and may contain
information that is privileged and confidential.  If you are not the intended
recipient, you are hereby notified that any dissemination of this
communication is strictly prohibited.  If you have received this communication
in error, please erase all copies of the message and its attachments and
notify us immediately.