# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **SALIM MOHAMMED ADAM BIN AMIR,** | ) ) ) |
| **BISHER AL-RAWI,** | ) ) ) |
| *Petitioners,* | ) ) |
| *v.* | )Civil Action No. 1:05CV01724 (RMU) |
| **GEORGE W. BUSH,** *et al.,* | ) ) ) |
| *Respondents.* | ) ) |

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' MOTION FOR THE IMMEDIATE ISSUANCE OF A WRIT OF *HABEAS CORPUS* PURSUANT TO 28 U.S.C. § 2243 <u>OR, ALTERNATIVELY, FOR AN ORDER TO SHOW CAUSE</u>

# EXHIBIT 1



**DEPUTY SECRETARY OF DEFENSE**
1010 DEFENSE PENTAGON
WASHINGTON, DC 20301-1010

— 7 JUL 2004

## MEMORANDUM FOR THE SECRETARY OF THE NAVY

**SUBJECT:    Order Establishing Combatant Status Review Tribunal**

This Order applies only to foreign nationals held as enemy combatants in the control of the Department of Defense at the Guantanamo Bay Naval Base, Cuba ("detainees").

*a. Enemy Combatant.* For purposes of this Order, the term "enemy combatant" shall mean an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces. Each detainee subject to this Order has been determined to be an enemy combatant through multiple levels of review by officers of the Department of Defense.

*b. Notice.* Within ten days after the date of this Order, all detainees shall be notified of the opportunity to contest designation as an enemy combatant in the proceeding described herein, of the opportunity to consult with and be assisted by a personal representative as described in paragraph (c), and of the right to seek a writ of habeas corpus in the courts of the United States.

*c. Personal Representative.* Each detainee shall be assigned a military officer, with the appropriate security clearance, as a personal representative for the purpose of assisting the detainee in connection with the review process described herein. The personal representative shall be afforded the opportunity to review any reasonably available information in the possession of the Department of Defense that may be relevant to a determination of the detainee's designation as an enemy combatant, including any records, determinations, or reports generated in connection with earlier determinations or reviews, and to consult with the detainee concerning that designation and any challenge thereto. The personal representative may share any information with the detainee, except for classified information, and may participate in the Tribunal proceedings as provided in paragraph (g)(4).

*d. Tribunals.* Within 30 days after the detainee's personal representative has been afforded the opportunity to review the reasonably available information in the possession of the Department of Defense and had an opportunity to consult with the detainee, a Tribunal shall be convened to review the detainee's status as an enemy combatant.

*e. Composition of Tribunal.* A Tribunal shall be composed of three neutral commissioned officers of the U.S. Armed Forces, each of whom possesses the appropriate security clearance and none of whom was involved in the apprehension,



detention, interrogation, or previous determination of status of the detainee. One of the members shall be a judge advocate. The senior member (in the grade of 0-5 and above) shall serve as President of the Tribunal. Another non-voting officer, preferably a judge advocate, shall serve as the Recorder and shall not be a member of the Tribunal.

*f. Convening Authority.* The Convening Authority shall be designated by the Secretary of the Navy. The Convening Authority shall appoint each Tribunal and its members, and a personal representative for each detainee. The Secretary of the Navy, with the concurrence of the General Counsel of the Department of Defense, may issue instructions to implement this Order.

*g. Procedures.*

(1) The Recorder shall provide the detainee in advance of the proceedings with notice of the unclassified factual basis for the detainee's designation as an enemy combatant.

(2) Members of the Tribunal and the Recorder shall be sworn. The Recorder shall be sworn first by the President of the Tribunal. The Recorder will then administer an oath, to faithfully and impartially perform their duties, to all members of the Tribunal to include the President.

(3) The record in each case shall consist of all the documentary evidence presented to the Tribunal, the Recorder's summary of all witness testimony, a written report of the Tribunal's decision, and a recording of the proceedings (except proceedings involving deliberation and voting by the members), which shall be preserved.

(4) The detainee shall be allowed to attend all proceedings, except for proceedings involving deliberation and voting by the members or testimony and other matters that would compromise national security if held in the presence of the detainee. The detainee's personal representative shall be allowed to attend all proceedings, except for proceedings involving deliberation and voting by the members of the Tribunal.

(5) The detainee shall be provided with an interpreter, if necessary.

(6) The detainee shall be advised at the beginning of the hearing of the nature of the proceedings and of the procedures accorded him in connection with the hearing.

(7) The Tribunal, through its Recorder, shall have access to and consider any reasonably available information generated in connection with the initial determination to hold the detainee as an enemy combatant and in any subsequent reviews of that determination, as well as any reasonably available records, determinations, or reports generated in connection therewith.

(8) The detainee shall be allowed to call witnesses if reasonably available, and to question those witnesses called by the Tribunal. The Tribunal shall determine the

reasonable availability of witnesses. If such witnesses are from within the U.S. Armed Forces, they shall not be considered reasonably available if, as determined by their commanders, their presence at a hearing would affect combat or support operations. In the case of witnesses who are not reasonably available, written statements, preferably sworn, may be submitted and considered as evidence.

(9) The Tribunal is not bound by the rules of evidence such as would apply in a court of law. Instead, the Tribunal shall be free to consider any information it deems relevant and helpful to a resolution of the issue before it. At the discretion of the Tribunal, for example, it may consider hearsay evidence, taking into account the reliability of such evidence in the circumstances. The Tribunal does not have the authority to declassify or change the classification of any national security information it reviews.

(10) The detainee shall have a right to testify or otherwise address the Tribunal in oral or written form, and to introduce relevant documentary evidence.

(11) The detainee may not be compelled to testify before the Tribunal.

(12) Following the hearing of testimony and the review of documents and other evidence, the Tribunal shall determine in closed session by majority vote whether the detainee is properly detained as an enemy combatant. Preponderance of evidence shall be the standard used in reaching this determination, but there shall be a rebuttable presumption in favor of the Government's evidence.

(13) The President of the Tribunal shall, without regard to any other provision of this Order, have authority and the duty to ensure that all proceedings of or in relation to the Tribunal under this Order shall comply with Executive Order 12958 regarding national security information.

*h. The Record.* The Recorder shall, to the maximum extent practicable, prepare the record of the Tribunal within three working days of the announcement of the Tribunal's decision. The record shall include those items described in paragraph (g)(3) above. The record will then be forwarded to the Staff Judge Advocate for the Convening Authority, who shall review the record for legal sufficiency and make a recommendation to the Convening Authority. The Convening Authority shall review the Tribunal's decision and, in accordance with this Order and any implementing instructions issued by the Secretary of the Navy, may return the record to the Tribunal for further proceedings or approve the decision and take appropriate action.

*i. Non-Enemy Combatant Determination.* If the Tribunal determines that the detainee shall no longer be classified as an enemy combatant, the written report of its decision shall be forwarded directly to the Secretary of Defense or his designee. The Secretary or his designee shall so advise the Secretary of State, in order to permit the Secretary of State to coordinate the transfer of the detainee for release to the detainee's

country of citizenship or other disposition consistent with domestic and international obligations and the foreign policy of the United States.

 *j.* This Order is intended solely to improve management within the Department of Defense concerning its detention of enemy combatants at Guantanamo Bay Naval Base, Cuba, and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law, in equity, or otherwise by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

 *k.* Nothing in this Order shall be construed to limit, impair, or otherwise affect the constitutional authority of the President as Commander in Chief or any authority granted by statute to the President or the Secretary of Defense.

 This Order is effective immediately.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SALIM MOHAMMED ADAM BIN AMIR,** | ) ) ) |
| **BISHER AL-RAWI,** | ) ) |
| *Petitioners,* | ) ) |
| *v.* | )Civil Action No. 1:05CV01724 (RMU) |
| **GEORGE W. BUSH,** *et al.,* | ) ) ) |
| *Respondents.* | ) ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF
PETITIONERS' MOTION FOR THE IMMEDIATE
ISSUANCE OF A WRIT OF *HABEAS CORPUS* PURSUANT TO 28 U.S.C. § 2243
OR, ALTERNATIVELY, FOR AN ORDER TO SHOW CAUSE**

# EXHIBIT 2

((MSG016 RTF    SECRET    Page 1

b6 -1
b7C -1

From _____ (INSD) (FBI)    b6 -1
To Caproni, Valerie E (OGC) (FBI)    b7C -1
cc
Subject FW GTMO

SENSITIVE BUT UNCLASSIFIED
NON-RECORD

Here is the second summary  One more to go
-----Original Message-----
From _____ BS) (FBI)
Sent Monday, August 02, 2004 10 46 AM    b6 -1
To _____ (INSD) (FBI)    b7C -1
Subject RE GTMO

SENSITIVE BUT UNCLASSIFIED
NON-RECORD

Mr _____    b6 -1
               b7C -1

As requested, here is a brief summary of what I observed at GTMO

On a couple of occassions, I entered interview rooms to find a detainee chained hand and foot in a fetal position to the floor, with no chair, food, or water  Most times they had urinated or defacated on themselves, and had been left there for 18, 24 hours or more  On one occassion, the air conditioning had been turned down so far and the temperature was so cold in the room, that the barefooted detainee was shaking with cold  When I asked the MP's what was going on, I was told that interrogators from the day prior had ordered this treatment, and the detainee was not to be moved  On another occassion, the A/C had been turned off, making the temperature in the unventilated room probably well over 100 degrees  The detainee was almost unconcious on the floor, with a pile of hair next to him  He had apparently been literally pulling his own hair out throughout the night  On another occassion, not only was the temperature unbearably hot, but extremely loud rap music was being played in the room, and had been since the day before, with the detainee chained hand and foot in the fetal position on the tile floor

Any questions, feel free to call or ask via email _____    b2 -1
                                                              b6 -1
                                                              b7C -1
-----Original Message-----
From _____ (INSD) (FBI)
Sent Thursday, July 29, 2004 10 58 AM    b6 -1
To _____ (BS) (FBI)    b7C -1
Subject RE GTMO

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE

DATE: 11-09-2004
CLASSIFIED BY 615 9DHH/BCP/njg 04-CV-4151
REASON 1 4 (C)
DECLASSIFY ON: 11-09-2029

SENSITIVE BUT UNCLASSIFIED
NON-RECORD

SECRET

DETAINEES-1760    1760

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SALIM MOHAMMED ADAM BIN AMIR, | ) ) ) |
| | ) |
| BISHER AL-RAWI, | ) ) |
| *Petitioners,* | ) ) |
| *v.* | )Civil Action No. 1:05CV01724 (RMU) |
| | ) |
| GEORGE W. BUSH, *et al.,* | ) ) |
| *Respondents.* | ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF
PETITIONERS' MOTION FOR THE IMMEDIATE
ISSUANCE OF A WRIT OF *HABEAS CORPUS* PURSUANT TO 28 U.S.C. § 2243
OR, ALTERNATIVELY, FOR AN ORDER TO SHOW CAUSE**

# EXHIBIT 3



{{MSG016 RTF}}                     SECRET                                      Page 2

b6 -1
b7C -1

Could you please provide a short summary of what you observed?  Thanks

-----Original Message-----
From                    (BS) (FBI)        b6 -1
Sent  Monday, July 12, 2004 10 10 AM      b7C -1
To                    (INSD) (FBI)
Subject  RE GTMO

SENSITIVE BUT UNCLASSIFIED
NON-RECORD

                          b6 -1
Mr                        b7C -1

I am responding to your request for feedback on aggressive treatment and improper interview techniques
used on detainees at GTMO  I did observe treatment that was not only aggressive, but personally very
upsetting, although I can't say that this treatment was perpetrated by Bureau employees  It seemed that
b1    these techniques were being employed by the military, government contract employees and

b2 -1   My name is SA                    Boston Division, EOD          currently assigned to Squad C-9,
b6 -1   telephone
b7C -1                                                                                          [S]

SENSITIVE BUT UNCLASSIFIED


SENSITIVE BUT UNCLASSIFIED


SENSITIVE BUT UNCLASSIFIED


SENSITIVE BUT UNCLASSIFIED


                          SECRET

                                      DETAINEES-1761              1761

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SALIM MOHAMMED ADAM BIN AMIR, | ) ) ) |
| BISHER AL-RAWI, | ) ) ) |
| *Petitioners*, | ) ) |
| *v.* | )Civil Action No. 1:05CV01724 (RMU) |
| GEORGE W. BUSH, *et al.*, | ) ) ) |
| *Respondents.* | ) ) ) |

MEMORANDUM OF LAW IN SUPPORT OF
PETITIONERS' MOTION FOR THE IMMEDIATE
ISSUANCE OF A WRIT OF *HABEAS CORPUS* PURSUANT TO 28 U.S.C. § 2243
OR, ALTERNATIVELY, FOR AN ORDER TO SHOW CAUSE

# EXHIBIT 4

**The following text may be printed, copy/pasted, or downloaded and emailed.**

## Military Extends Guantanamo Abuse Probe

REUTERS
February 2, 2005

MIAMI - The U.S. military extended by four weeks its investigation into FBI allegations that prisoners were tortured at the Guantanamo detention camp and said on Tuesday it needed more time to question witnesses in several countries.

The military's Southern Command, which oversees the controversial camp for foreign terrorism suspects at the U.S. Naval base in Guantanamo Bay, Cuba, had asked two officers to investigate and report back by Feb. 1.

SouthCom's commander, Gen. Bantz Craddock, extended the deadline to Feb. 28 and said further extensions could not be ruled out because the investigators need to reach widely scattered witnesses who had been at Guantanamo.

``These witnesses are located from Maine to California, nationally, and from Iraq to Korea, internationally,'' Craddock said in a written statement.

The allegations date back to 2002, the year the camp opened, and military personnel, interrogators and FBI agents have regularly rotated through Guantanamo since then.

Craddock ordered the investigation last month after the public release of FBI documents that described prisoners shackled in a fetal position on the floor for up to 24 hours and left in their own urine and feces.

One described an interrogation in which a prisoner was wrapped in an Israeli flag and bombarded with loud music and strobe light. Another reported seeing a barely conscious prisoner who had torn out his hair after being left overnight in a sweltering room.

The American Civil Liberties Union obtained the documents under court order through a freedom of information request and publicly released them.

The United States holds about 545 men it suspects of al Qaeda links at Guantanamo, most of them captured during the Afghanistan war that followed the Sept. 11, 2001, attacks on America.

The Bush administration does not consider them prisoners of war, who would be protected under the Geneva Conventions from torture and coercive interrogation.

Several former prisoners have said they were beaten, threatened with dogs and subjected to freezing temperatures, and the International Committee of the Red Cross has said their treatment was ``tantamount to torture.''

Military officials at Guantanamo have repeatedly denied the claims, but both SouthCom and the Justice Departments launched investigations after the disclosure of the FBI documents.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SALIM MOHAMMED<br>ADAM BIN AMIR,<br><br>BISHER AL-RAWI,<br><br>*Petitioners,*<br><br>*v.*<br><br>GEORGE W. BUSH, *et al.,*<br><br>*Respondents.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)Civil Action No. 1:05CV01724 (RMU)<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM OF LAW IN SUPPORT OF
PETITIONERS' MOTION FOR THE IMMEDIATE
ISSUANCE OF A WRIT OF *HABEAS CORPUS* PURSUANT TO 28 U.S.C. § 2243
OR, ALTERNATIVELY, FOR AN ORDER TO SHOW CAUSE

# EXHIBIT 5

**Reprinted from NewsMax.com**

## Videos Show Guantanamo Prisoner Abuse

### NewsMax.com Wires
**Tuesday, Feb. 1, 2005**

SAN JUAN, Puerto Rico -- Videotapes of riot squads subduing troublesome terror suspects at the U.S. prison camp at Guantanamo Bay show the guards punching some detainees, tying one to a gurney for questioning and forcing a dozen to strip from the waist down, according to a secret report. One squad was all-female, traumatizing some Muslim prisoners.

Investigators from U.S. Southern Command in Miami, which oversees the camp in Cuba, wrote the report that was obtained by The Associated Press after spending a little over a week in June reviewing 20 of some 500 hours of videotapes involving "Immediate Reaction Forces." The camp's layout prevented videotaping in all the cells where the five-person teams - also known as "Immediate Response Forces" - operated, the report said.

Although the report cited several cases of physical force, reviewers said they found no evidence of systemic detainee abuse, according to the six-page summary dated June 19, 2004. An official familiar with the report authenticated it, speaking to AP on condition of anonymity. AP also reviewed an unclassified log of the videotape footage.

The tapes raised questions about mistreatment and misconduct, however, said the investigators, who suggested some clips needed more scrutiny to rule out abuse. The military has cited 10 substantiated cases of abuse at Guantanamo, and announced Tuesday an extension would be granted for an investigation to interview of witnesses in the United States and abroad.

One such clip the investigators flagged was from Feb. 17, 2004. It showed "one or more" team members punching a detainee "on an area of his body that seemingly would be inconsistent with striking a pressure point," which is a sanctioned tactic for subduing prisoners.

In five other clips showing detainees who appeared to have been punched by team members, the investigators said: "The punching was in line with accepted law enforcement practice of striking the pressure point on the back of the thigh to temporarily distract the detainee."

In other "questionable" cases, reviewers said a video showed a guard kneeing a detainee in the head, while another showed a team securing a detainee to a gurney for an interrogation.

A separate clip captured a platoon leader taunting a detainee with pepper spray and repeatedly spraying him before letting the reaction team enter the cell, reviewers wrote.

Investigators also noted about a dozen cases where detainees were stripped from the waist down and taken to the "Romeo block," of the camp. No female guards were involved, they said.

Romeo block is a camp section where prisoners were often left naked for days, according to two former detainees, Britons Shafiq Rasul and Asif Iqbal, who were released last year.

Although no female guards were videotaped in any of the stripping cases, investigators cautioned the U.S. government about using the all-female team to handle disruptive detainees, citing religious and

cultural issues. Many of the prisoners are Muslim men and under strict interpretations of Islam view contact with other women other than their wives as taboo.

"Several detainees express displeasure about female MPs either escorting them, or touching them as members of an IRF team," the report says. "Because some have questioned our sensitivity to the detainees' religion and culture, we believe that talking points are appropriate to address incorporation of female soldiers into the guard force."

In one video clip of the reaction teams, the memo says, "A detainee appears to be genuinely traumatized by a female escort securing the detainee's leg irons. In another video, inexplicably an all-female IRF team forcibly extracts a detainee from his cell."

While stating that female troops have a right to serve as equals alongside their male counterparts, investigators warned the all-female team could create the perception that the gender of the squad was taken into consideration for the Muslim population.

"By forming an all-female IRF team for use with one detainee we potentially undercut our position that we do not distinguish between male and female soldiers. Clearly, the soldiers' gender did play a role in forming the all-female IRF team," the memo says.

The memo suggests that military "personnel showing the IRF videos outside of (Defense Department) channels should be prepared with talking points to refute or diminish the charge that we use women (against) the detainees' culture or religion."

The U.S. military wouldn't comment on whether there's a specific strategy involved in using an all-female response force but said female guards - who serve on mixed reaction teams as well - comprise about 20 percent of the guard force.

"As a matter of policy, we do not discuss specific Immediate Response Force composition or methods, but they are consistent with those used in the corrections profession and are always carried out with the security and safety of detainees and troopers in mind," said Lt. Col. James Marshall, a spokesman at U.S. Southern Command.

Prisoners released from Guantanamo have accused the extraction teams of abuse and one former U.S. National Guardsmen received brain damage after posing undercover as a rowdy detainee and being beaten by teammates.

"The obvious problem with our armed forces is their inability to comply with international law," said Arsalan T. Iftikhar, national legal director for the Washington, D.C.-based Council on American-Islamic Relations. "Many of us thought that the Abu Ghraib scandal in Iraq was going to shake us into awakening but it seems like the things we keep learning about Guantanamo indicate there was, in fact, systematic abuse."

Joe Navarro, a former FBI interrogator who has taught questioning methods and is familiar with Guantanamo, said treating prisoners poorly makes them more stubborn and unwilling to talk.

"The military has been cavalier in their attitudes toward these individuals to the point that it has been detrimental to the overall mission," Navarro told AP.

The American Civil Liberties Union has filed a Freedom of Information Act request asking for all

photographs and videotapes depicting the treatment of the detainees.

Although a court ordered the government to comply with the ACLU request and turn over documents - thousands of which the ACLU has received - the government has refused to provide videos, citing privacy concerns, said Jameel Jaffer, an ACLU attorney.

Although the extraction team actions are videotaped, interrogations with detainees aren't.

The use of female guards and interrogators has created controversy.

A former Army linguist who served at Guantanamo as an Arabic translator from December 2002 to June 2003 wrote in a draft manuscript that female interrogators tried to break Muslim detainees by sexual touching, wearing a miniskirt and thong underwear and in one case smearing a Saudi man's face with fake menstrual blood. The draft written by former Army Sgt. Erik R. Saar was obtained by AP, which reported on its contents last week.

About 545 prisoners from some 40 countries are being held at Guantanamo Bay, Cuba, most accused of links to Afghanistan's ousted Taliban regime or al-Qaida terror network.

© 2005 The Associated Press

**Editor's note:**
- Elvis meets Nixon – check it out – Click Here.
- Tommy Franks' best-selling book "American Soldier" – FREE OFFER – Click Here Now
- Arnold Schwarzenegger Stamp Poster Available Here! Free offer: Click Here Now

**Read more on this subject in related Hot Topics:**
War on Terrorism

102

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SALIM MOHAMMED<br>ADAM BIN AMIR,<br><br>BISHER AL-RAWI,<br><br>*Petitioners,*<br><br>*v.*<br><br>GEORGE W. BUSH, *et al.,*<br><br>*Respondents.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)Civil Action No. 1:05CV01724 (RMU)<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM OF LAW IN SUPPORT OF
PETITIONERS' MOTION FOR THE IMMEDIATE
ISSUANCE OF A WRIT OF *HABEAS CORPUS* PURSUANT TO 28 U.S.C. § 2243
<u>OR, ALTERNATIVELY, FOR AN ORDER TO SHOW CAUSE</u>

# EXHIBIT 6

1 of 1 DOCUMENT

Copyright 2005 The Washington Post
The Washington Post

February 10, 2005 Thursday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 1348 words

**HEADLINE:** Detainees Accuse Female Interrogators;
Pentagon Inquiry Is Said to Confirm Muslims' Accounts of Sexual Tactics at Guantanamo

**BYLINE:** Carol D. Leonnig and Dana Priest, Washington Post Staff Writers

**BODY:**

Female interrogators repeatedly used sexually suggestive tactics to try to humiliate and pry information from devout Muslim men held at the U.S. military prison at Guantanamo Bay, Cuba, according to a military investigation not yet public and newly declassified accounts from detainees.

The prisoners have told their lawyers, who compiled the accounts, that female interrogators regularly violated Muslim taboos about sex and contact with women. The women rubbed their bodies against the men, wore skimpy clothes in front of them, made sexually explicit remarks and touched them provocatively, at least eight detainees said in documents or through their attorneys.

A wide-ranging Pentagon investigation, which has not yet been released, generally confirms the detainees' allegations, according to a senior Defense Department official familiar with the report. While isolated accounts of such tactics have emerged in recent weeks, the new allegations and the findings of the Pentagon investigation indicate that sexually oriented tactics may have been part of the fabric of Guantanamo interrogations, especially in 2003.

The inquiry uncovered numerous instances in which female interrogators, using dye, pretended to spread menstrual blood on Muslim men, the official said. Separately, in court papers and public statements, three detainees say that women smeared them with blood.

The military investigation of U.S. detention and interrogation practices worldwide, led by Vice Adm. Albert T. Church III, confirmed one case in which an Army interrogator took off her uniform top and paraded around in a tight T-shirt to make a Guantanamo detainee uncomfortable, and other cases in which interrogators touched the detainees suggestively, the senior Pentagon official said.

The official, who spoke on the condition of anonymity because the report has not yet been made public, said the fake blood was used on Muslim men before they intended to pray, because some Muslims believe that "if a woman touches him prior to prayer, then he's dirty and can't pray." Muslim men also believe that contact with women other than their wives diminishes religious purity.

Defense Department officials said they have reprimanded two female interrogators for such tactics. It is unclear whether military personnel, employees of other agencies or private contractors were involved.

The attorney interviews of detainees are the result of a Supreme Court decision last summer that gave the captives access to lawyers and the opportunity to challenge their incarceration in U.S. courts.

In previous documents, detainees have complained of physical abuse, including routine beatings, painful shackling, and exposure to extremes of hot and cold. Defense Secretary Donald H. Rumsfeld insisted then that detainees were treated "humanely," and Pentagon officials said terrorists were trained to fabricate torture allegations.

The Washington Post February 10, 2005 Thursday

Some of the accounts resemble the sexual aspects of the humiliation of Iraqi prisoners at the U.S. prison at Abu Ghraib. Photographs that became public last year showed a servicewoman there holding naked prisoners on a leash and posing next to a pile of naked prisoners.

Pentagon officials said yesterday that wearing skimpy clothing or engaging in provocative touching and banter would be inappropriate interrogation techniques.

"I don't see that as being authorized by secretary of defense's approved interrogation techniques for Guantanamo," said Col. David McWilliams, a spokesman for the U.S. Southern Command in Miami, which oversees operations at Guantanamo Bay.

McWilliams said it is premature to comment on whether the detainee allegations are credible until a second military investigation that focuses on Guantanamo Bay abuse allegations is complete. The inquiry, which began in early January after the release of documents in which FBI agents said they witnessed abuse, is scheduled to be completed this month.

"That's exactly why we're doing an investigation," McWilliams said. "We're going to establish the facts and the truth."

Church's report found that interrogators used sexually oriented tactics and harassment to shock or offend Muslim prisoners, the senior Pentagon official said. The official said that the military would not condone "sexual activity" during interrogation, but that good interrogators "take initiative and are a little creative."

"They are trying to find the key that will get someone to talk to them. Using things that are culturally repulsive is okay as long as it doesn't extend to something prohibited by the Geneva Conventions."

Attorneys for detainees scoffed at the Pentagon's insistence that the military can fairly investigate its own personnel. They noted that the Defense Department last fall initially dismissed torture allegations, insisting that detainees were trained at terrorist camps to lodge false claims.

Even detainee lawyers doubted that interrogators would spread menstrual blood on prisoners when a recently released British detainee first made the allegation in early 2004. A month ago, a Pentagon spokesman confirmed it had verbally reprimanded one female interrogator who, in early 2003, had smeared red dye from a marker on a detainee's shirt and told him it was blood.

In a yet-to-be-published book, former Army translator Erik Saar said he saw a female interrogator smear red dye on a Saudi man's face, telling him it was blood. Saar's account was first reported by the Associated Press last month. And Mamdouh Habib, an Australian man released from Guantanamo Bay last month, said he was strapped down while a woman told him she was "menstruating" on his face.

One lawyer, Marc Falkoff, said in an interview that when a Yemeni client told him a few weeks ago about an incident involving menstrual blood, "I almost didn't even write it down." He said: "It seemed crazy, like something out of a horror movie or a John Waters film. Now it doesn't seem ludicrous at all."

Some of the newly declassified accounts of detainees evoke scenes from a rock music video. German detainee Murat Kurnaz told his lawyer that three women in lacy bras and panties strutted into the interrogation room where he was sitting in chains. They cooed about how attractive he was and suggested "they could have some fun," he said.

When Kurnaz averted his eyes, he said, one woman sat on his lap, another rubbed her breasts against his back and massaged his chest and a third squatted near his crotch. He head-butted the woman behind him, he said, knocking her off him. All three ran out and a team of soldiers stormed in and beat him, he said.

Detainee lawyers likened the tactics to Nazis shaving the beards of orthodox Jews or artists dunking a crucifix in urine to shock Christians. "They're exploiting religious beliefs to break them down, to destroy them," said Michael Ratner of the Center for Constitutional Rights, which represents several dozen detainees. "What they're doing, it reminds me of a pornographic Web site -- it's like the fantasy of all these S&M clubs."

Falkoff said some of his clients have also been threatened with rape by male interrogators.

One soldier told another detainee, Muktar Warafi, that he had to start telling the truth or he would be raped, according to Falkoff's notes of the interview. When he left the room, another person immediately came into the room and told Warafi: "That interrogator is new and doesn't know the rules. We apologize on his behalf. Now let's talk."

The Washington Post February 10, 2005 Thursday

Yasein Esmail, a Yemeni detainee, said he had been interrogated more than 100 times since being "kidnapped" in a marketplace in Kabul, Afghanistan, and brought to Guantanamo Bay. He recounted to his lawyer that when he refused to talk in one interview, a female soldier entered wearing a tight T-shirt.

"Why aren't you married?" she reportedly asked Esmail. "You are a young man and have needs. What do you like?"

Esmail said "she bent down with her breasts on the table and her legs almost touching" him. "Are you going to talk," she asked, "or are we going to do this for six hours?"

Researcher Julie Tate contributed to this report.

**LOAD-DATE:** February 10, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SALIM MOHAMMED ADAM BIN AMIR,<br><br>BISHER AL-RAWI,<br><br>*Petitioners,*<br><br>*v.*<br><br>GEORGE W. BUSH, *et al.,*<br><br>*Respondents.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)Civil Action No. 1:05CV01724 (RMU)<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM OF LAW IN SUPPORT OF
PETITIONERS' MOTION FOR THE IMMEDIATE
ISSUANCE OF A WRIT OF *HABEAS CORPUS* PURSUANT TO 28 U.S.C. § 2243
<u>OR, ALTERNATIVELY, FOR AN ORDER TO SHOW CAUSE</u>

# EXHIBIT 7

1 of 1 DOCUMENT

Copyright 2003 Associated Press
All Rights Reserved
Associated Press Online

These materials may not be republished without the express written consent of The
Associated Press

August 20, 2003 Wednesday

**SECTION:** DOMESTIC NEWS

**LENGTH:** 189 words

**HEADLINE:** Guantanamo Suicide Attempts Rise to 31

**DATELINE:** WASHINGTON

**BODY:**

Another terrorism suspect at the Pentagon's prison in Guantanamo Bay, Cuba, has tried to kill himself, the second such attempt in as many weeks.

This week's suicide attempt was the 31st since the high-security prison opened in January 2002, Pentagon spokeswoman Lt. Cmdr. Barbara Burfeind said Wednesday. She said the suicide attempt happened in the last few days but could not be more specific.

Twenty prisoners have tried to kill themselves, some more than once. None have so far succeeded.

Most attempts occurred this year, which officials and critics alike have attributed to the effects of indefinite detentions on prisoner morale. Some of the prisoners have been held for more than a 18 months without charges, access to lawyers or indications of whether or when they may be freed.

U.S. authorities are holding some 660 prisoners from 42 countries at Guantanamo on suspicion of links to the al-Qaida terrorist network or Afghanistan's fallen Taliban regime.

President Bush has named six prisoners who could be tried before military tribunals. The next step is for a chief prosecutor to draft charges against them.

**LOAD-DATE:** August 21, 2003



EXHIBIT

6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **SALIM MOHAMMED** | ) |
| **ADAM BIN AMIR,** | ) |
|  | ) |
| **BISHER AL-RAWI,** | ) |
|  | ) |
| *Petitioners,* | ) |
|  | ) |
| *v.* | )Civil Action No. 1:05CV01724 (RMU) |
|  | ) |
| **GEORGE W. BUSH,** *et al.,* | ) |
|  | ) |
| *Respondents.* | ) |
|  | ) |

## MEMORANDUM OF LAW IN SUPPORT OF
## PETITIONERS' MOTION FOR THE IMMEDIATE
## ISSUANCE OF A WRIT OF *HABEAS CORPUS* PURSUANT TO 28 U.S.C. § 2243
## <u>OR, ALTERNATIVELY, FOR AN ORDER TO SHOW CAUSE</u>

# EXHIBIT 8

## 89 prisoners resume hunger strike at Guantanamo

Detainees say US military broke July pact

Charlie Savage
Boston Globe Staff
August 26, 2005

WASHINGTON -- New tensions between Guantanamo Bay detainees and the US military have prompted 89 prisoners to resume a hunger strike that so far has left seven hospitalized, a spokesman for the military operation confirmed yesterday.

The prisoners, protesting their living conditions and their continued detention without trials, had undertaken a widespread hunger strike that ended in July. Word that the hunger strike had resumed was disclosed yesterday by Clive Stafford Smith, a British human rights lawyer who returned from visiting clients at the base a week ago.

Smith warned that many detainees have grown so desperate that they intend to starve themselves to death in an effort to create a public relations disaster for the US military. No detainee has died at the prison since it opened in January 2002, but, in the view of lawyers who have talked to clients, there have been signs of extreme frustration this summer.

According to Smith's newly declassified notes, his client Binyam Mohammed, a British refugee from Ethiopia, told him on Aug. 11 that many among the prison population had decided to resume their hunger strike. The decision was sparked by rumors of a violent interrogation session and two rough extractions of detainees from their cells, as well as a new incident of alleged desecration of a copy of the Koran, the Muslim holy book.

The detainees viewed the rumors as a violation of an agreement struck at the end of July to bring an end to the hunger strike, Smith said. Meeting with detainee representatives, the military had promised a series of improvements to living conditions if they would start eating again.

"They have betrayed our trust," Smith's declassified notes quote Mohammed as saying. "Therefore the strike must begin again. Some have already begun. . . . I do not plan to stop until I either die or we are respected. People will definitely die."

Army Colonel Brad Blackner, a spokesman for the prison operation, confirmed yesterday that "detainees began fasting to protest their continued detention" on Aug. 8. He said the military views this as a continuation of the July hunger strike, not a new one.

"We are monitoring some detainees who have missed at least nine meals over a 72-hour period, which we define as a hunger strike," Blackner said.

Smith was the last attorney to return from Guantanamo because the military did not allow any detainee representatives to visit the base last week. He represents several dozen detainees, but only his notes of his conversation with Mohammed have been partially declassified. "This is all that is unclassified for now, but you can imagine that there is much more," he said. "This is very urgent, as you can infer from the statement that if they stopped eating on Aug. 11 or so, this means that some of them could be getting in serious physical problems by the next week or so."

But Blackner said that the prison had dealt with hunger strikes regularly since the start, and that medical staff were closely monitoring the fasting detainees. Camp policy is to force-feed any detainee "to avert death from fasting and from dehydration," he said.

Smith's report of the resumption of the hunger strike was made as the military has declassified the notes of other lawyers who visited the base in the last month, clearing them to disclose what their clients told

them about what has been happening this summer.

Several lawyers said their clients reported that about 200 of the 500 prisoners participated in the July hunger strike, resulting in several dozen hospitalizations requiring intravenous fluids. The military said the number was closer to 100. Many detainees started to eat again around July 28, after the military promised to make concessions that allegedly varied from specific improvements to their living conditions to assurances they would receive trials.

Detainees were allegedly promised better access to books and that they would receive bottled drinking water with each meal, instead of having to drink what they considered unpalatable water out of the sinks in their cells. The military said last week it was seeking to expand the size of its library. Several attorneys said the military had started supplying bottled water in early August.

Jonathan Hafetz, who visited the base in late July to meet with a Qatari client, said his newly declassified notes indicate that the prisoners were primarily interested in improving their physical and religious conditions.

"He attributed the strike to the bad water and the lack of respect for Islam," he said. "For example, guards laughed at prisoners when they are praying and disrespect the Koran when they go into a cell to [restrain] a prisoner."

Joshua Colangelo-Bryan, who visited his six Bahraini clients in late July and early August, said things did improve after the agreement. In a cellblock where at least one of his clients is housed, he said, the military began turning off loud industrial fans during the calls-to-prayer.

"It was also said that international law would be recognized at Guantanamo, whatever that means," Colangelo-Bryan said. "It seems there was a probationary period . . . and if things did not change within that time, then a hunger strike of more severe proportions could be undertaken."

By the end of the first week of August, there was rising discontent among detainees who believed that they had been misled in order to get them to start eating again. Lawyer David Remes said his Yemeni clients told him during the first week of August that detainees were starting to doubt the promises that had been made in order to get them to relent.

"There is a sense that the government tricked them into ending their hunger strike by promising them the moon because the government couldn't tolerate a situation in which detainees were placing themselves at risk of death or serious injury as a result of being on the hunger strike," Remes said.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SALIM MOHAMMED ADAM BIN AMIR, | ) | |
| | ) | |
| BISHER AL-RAWI, | ) | |
| | ) | |
| *Petitioners*, | ) | |
| | ) | |
| *v.* | )Civil Action No. 1:05CV01724 (RMU) | |
| | ) | |
| GEORGE W. BUSH, *et al.*, | ) | |
| | ) | |
| *Respondents*. | ) | |

MEMORANDUM OF LAW IN SUPPORT OF
PETITIONERS' MOTION FOR THE IMMEDIATE
ISSUANCE OF A WRIT OF *HABEAS CORPUS* PURSUANT TO 28 U.S.C. § 2243
OR, ALTERNATIVELY, FOR AN ORDER TO SHOW CAUSE

# EXHIBIT 9

CNN.com - Hunger strike at Guantanamo grows - Sep 13, 2005                Page 1 of 3

 **.com.** Member Services                International Editio

WITH FREE VIDEO

SEARCH    ⦿ THE WEB  ○ CNN.com    [                    ]    SEARCH    Powered by

| Home Page | |
| Home Page | **WORLD** |
| World | |
| U.S. | ## Hunger strike at Guantanamo grows |
| Weather | |
| Business | |
| Sports | **Eighteen detainees being force-fed; 128 now refusing to eat** |
| Politics | |
| Law | From Mike Mount |
| Technology | CNN |
| Science & Space | |
| Health | Tuesday, September 13, 2005; Posted: 10:27 p.m. EDT (02:27 GMT) |

Home Page
World
U.S.
Weather
Business
Sports
Politics
Law
Technology
Science & Space
Health
Entertainment
Travel
Education
Special Reports
Video
Autos

Whistle while
you work...
and play!
citi

SERVICES
E-mail Newsletters
Your E-mail Alerts
RSS
CNNtoGO
Contact Us

SEARCH
⦿ WEB ○ CNN.com

SEARCH  Powered by
YAHOO! search

**WASHINGTON (CNN)** — The number of Guantanamo Bay detainees taking part in a hunger strike has swelled to about a quarter of the prison population over the past month, according to Pentagon officials.



Since August 8, the number of detainees refusing food has slowly increased from several dozen to 128, according to the Pentagon.

Eighteen prisoners are in medical facilities forcibly receiving nutrition intravenously or through nasal tubes, Pentagon officials said.

Last month officials said 89 detainees were refusing to eat and 12 were receiving forced nutrition in the medical facility.

Since the prison camp at the U.S. Naval Station in Guantanamo Bay, Cuba, opened in January 2002, there have been numerous hunger strikes by detainees. No prisoner has died from starvation, according to Pentagon officials.

"Regulations are the same at Guantanamo as they are in the U.S. prison system, and prisoners will not be allowed to kill themselves by starving themselves," a Pentagon official said.

Pentagon officials said the detainees are protesting their continued detention, but past detainee protests have occurred because of perceived treatment of the Quran by prison guards and treatment of the detainees by guards.

advertiser links            what's this?

**Save on All Your Calls with Vonage**
When looking for local regional and long distance calling, use Vonage to make...
www.vonage.com

**MyCashNow - $100 - $1,500 Overnight**
Payday Loan Cash goes in your account overnight. Very low fees. Fast decisions....
www.mycashnow.com

**Refinance Rates Fall Again**
Get $150,000 loan for $720 per month. Refinance while rates are low.
www.lowermybills.com

**Refinance Rates Hit Record Lows**
Get $150,000 loan for $720 per month. Refinance while rates are low.
www.lowermybills.com

**RELATED**

• U.S. officials: Transfer talks active
• CNN tours Gitmo prison camp
• U.N. experts blast U.S.

Search Je
Enter Keyw[
Enter City[
careerbu

Finc
Air
Chec
Book
FLYi.c

fly
inc








The previous hunger strike at the prison, known as Camp Delta, was in late July, when 68 detainees stopped eating.

All of the detainees started eating again on their own before the August 8 hunger strike, according to Pentagon officials.

The Washington Post reported Monday that lawyers for some of the detainees claim their clients are refusing to eat to protest their detention as well as the beatings they allege some detainees are receiving from prison guards.

Pentagon officials flatly deny that any of the detainees are beaten, including uncooperative ones.

- Russian detainees freed
- Suicide tries called 'coordinated'

**YOUR E-MAIL ALERTS**

Guantanamo Bay Naval Base        ⊙
(Cuba)

ACTIVATE | or Create Your Own

Manage Alerts | What Is This?

The Defense Department says more than 500 detainees are being held at the detention facility. Most were captured during the U.S.-led war in Afghanistan against the al Qaeda terrorist network and its local allies.

More than 30 countries are represented. But citizens from Saudi Arabia, Afghanistan and Yemen account for the majority of the detainees, 129, 110 and 107, the two U.S. officials told CNN last month.

Human rights activists and the Red Cross have criticized the treatment of prisoners at Guantanamo Bay. The controversy surrounding the facility in recent months prompted some lawmakers to suggest that it may need to be shut down.

But Bush administration officials have defended Guantanamo Bay. Vice President Dick Cheney said in June that the U.S. Guantanamo policy "is the correct one" and that all detainees are "treated with respect and dignity." (Full story)

News of the growing detainee protest came a day after Pentagon officials said Mullah Adbul Salam Zaeef, once the Taliban's ambassador to Pakistan and its primary spokesman during the early days of the U.S. invasion of Afghanistan, was released after an agreement between the Afghan government and the United States.

He was flown to Afghanistan from the Cuban base. He had been held at the prison camp since January 2002 after being arrested by Pakistani authorities and turned over to the United States.

**Story Tools**

Ⓒ✎ SAVE THIS     Ⓒ✉ E-MAIL THIS

Ⓒ🖨 PRINT THIS    Ⓒ☆ MOST POPULAR

advertisement

Click Here to try 4 Free Trial Issues of Time!



**WORLD**

Section Page · Video · International Edition



Iraq blasts claim 100 lives

- 2nd embassy blast death sentence
- U.N. reform agenda watered down
- Nigerians protest at fuel prices

**TOP STORIES**

Home Page · Video · Most Popular



Nursing home owners charged

- Baghdad attacks kill more than 100
- Carolinas brace for Hurricane Ophelia
- Roberts sidesteps specifics